UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

CHARLES RUSSELL, CHRISTOPHER
HUBBARD, HARRY WHITE, CARL
SMELLEY, CALDERONE PEARSON, SHANE
CARLINE, and COURTNEY WHITE,
individually and on behalf of all others similarly
situated,

      Plaintiffs

             v.

WAYNE COUNTY, MICHIGAN; BENNY
NAPOLEON, in his official capacity as Sheriff of
Wayne County; DANIEL PFANNES, in his official
capacity as the Undersheriff for the Wayne County
Sheriff's Office; ROBERT DUNLAP, in his
official capacity as Chief of Jails and Court
Operations; JAMES E. DAVIS, in his official
capacity as Deputy Chief of Jail Operations,

      Defendants.

Case No.

**Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief**

Class Action

**IMMEDIATE RELIEF SOUGHT**

## CLASS ACTION COMPLAINT

1.    Jails and prisons are rapidly becoming the epicenter of this country's fight against the novel Coronavirus Disease 2019 ("COVID-19"). The rate at which this disease is ravaging the globe is unprecedented in modern society, and its impact is being acutely felt by incarcerated populations. With approximately 47,000

1

confirmed cases and 4000 deaths,[1] Michigan is ranked third in the country for coronavirus-related deaths.[2] Of those confirmed cases and deaths from COVID-19, Wayne County, including the City of Detroit, accounts for almost half.[3] Data suggests that COVID-19 could further uniquely burden the city of Detroit where three of ten residents live in poverty, and, where residents have a high rate of asthma,[4] type 2 diabetes,[5] hypertension,[6] and other chronic diseases.[7]

2.    As of April 20th, Black people accounted for 40% of all deaths in Michigan from COVID-19, even though they represent only 13.6% of Michigan's

---

[1] Roberto Acosta, *Michigan reports 29 new coronavirus deaths; 547 new cases*, MLive (May 4, 2020), https://www.mlive.com/coronavirus/2020/05/michigan-reports-29-new-coronavirus-deaths-547-new-cases.html.

[2] *Michigan Has Highest U.S. Death Rate Among Confirmed Covid Cases*, Deadline Detroit (May 4, 2020), https://www.deadlinedetroit.com/articles/25152/michigan_has_nation_s_highest_death_rate_among_confirmed_covid_cases.

[3] Kristen Jordan Shamus, Kristi Tanner, & Niraj Warikoo, *Wayne County, Detroit account for 47% of state's coronavirus cases*, Detroit Free Press (May 4, 2020) https://www.freep.com/story/news/health/2020/04/03/coronavirus-covid-19-cases-wayne-county-detroit-michigan/5116620002/.

[4] Mary M. Chapman, Julie Bosman, & John Eligon, *Coronavirus Sweeps Through Detroit, a City That Has Seen Crisis Before*, N.Y. Times (Apr. 28, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-detroit.html.

[5] Erika Edwards, *Coronavirus comes for Detroit: Why certain Michigan residents are at higher risk*, NBC News (May 4, 2020), https://www.nbcnews.com/health/health-news/coronavirus-comes-detroit-why-certain-michigan-residents-are-higher-risk-n1172096.

[6] *Id.*

[7] *Id.*

2

population.[8] 1622 of the 3407 deaths from COVID-19 have come from Wayne County.[9] On average, 70% of the incarcerated individuals in the Wayne County Jail are Black, compared to only 39.7% of the general population of Wayne County.[10] Sixty-two percent of the people inside the jail are being held there pre-trial and presumptively innocent.[11]

3.      Hundreds of individuals caged inside the Wayne County Jail facilities—overwhelmingly Black, poor, and medically vulnerable—are prohibited from meaningfully protecting themselves against this global pandemic. As COVID-19 continues to gain a powerful foothold in the Wayne County Jail, incarcerated people are at significant risk of becoming infected and ultimately dying. Because of

---

[8] Kristin Jordan Shamus, *Michigan coronavirus task force on racial disparities dedicates work to Detroit girl, 5, who died*, Detroit Free Press (May 4, 2020), https://www.freep.com/story/news/health/2020/04/20/michigan-coronavirus-task-force-racial-disparities/5166777002/.

[9] M. Roy Wilson, *Lessons from Detroit on racial disparity and St. Louis coronavirus deaths,* St. Louis Post-Dispatch (May 4, 2020), https://www.stltoday.com/opinion/columnists/m-roy-wilson-lessons-from-detroit-on-racial-disparity-and-st-louis-coronavirus-deaths/article_61d3da39-8469-5719-b7d2-341a96cb73b5.html.

[10] The New Wayne County Jail Fact Sheet, (Apr. 28, 2020), https://static1.squarespace.com/static/5a413ae949fc2b12a2cb973f/t/5b439e7703ce64ad9899038e/1531158136066/Fact+Sheet+6.29+%281%29+%281%29.pdf; Vera Institute of Justice, "Wayne County, MI," Incarceration Trends (May 3, 2020), http://trends.vera.org/rates/wayne-county-mi?incarceration=count&incarcerationData=all.

[11] *Id.*

the actions and inactions of Wayne County's correctional facilities and the officials responsible for detainees' health and safety, individuals locked inside this jail are engaged in a fight for recognition of their humanity and for their very survival during this perilous and extraordinary time.

4. COVID-19 has already reached the Wayne County Jail. The disease has killed 2 contracted Jail physicians[12] and 2 deputies.[13] As of April 24, 2020, 177 employees and 13 detainees at the Wayne County Sheriff's Office have contracted the disease.[14] The outbreak within the jail poses a grave risk of harm and death that is ongoing.

5. A mass outbreak of COVID-19 in any of Michigan's Jails and prisons, including the Wayne County Jail, would further strain the state's struggling healthcare system. Michigan has constructed make-shift field hospitals, in an attempt

---

[12] Rudy Harper, *COVID-19 Claiming the Lives of Doctors who Treat Inmates*, WXYZ Detroit (Apr. 16, 2020), https://www.wxyz.com/news/coronavirus/covid-19-claiming-the-lives-of-doctors-who-treat-inmates.

[13] Meredith Spelbring, *2nd Wayne County Sheriff's Office deputy dies of coronavirus*, Detroit Free Press (Apr. 4, 2020), https://www.freep.com/story/news/local/michigan/wayne/2020/04/04/wayne-county-sheriff-deputy-dies-coronavirus-dean-savard/2947731001/.

[14] Ariana Taylor, *13 Inmates in the Wayne County Jail Have Contracted COVID-19*, The Detroit News (Apr. 24, 2020), https://www.detroitnews.com/story/news/local/wayne-county/2020/04/22/13-inmates-wayne-county-jail-have-contracted-covid-19/3005465001/.

to ease the collective burden on Southeastern Michigan hospitals.[15] Detroit-area hospitals are suffering significant staffing, supplies, and equipment shortages.[16] At Detroit's Sinai-Grace Hospital, the patient volume is so overwhelming that patients are lining the hallways, and some have died waiting for medical attention.[17] The state's chief medical officer, Dr. Joneigh Khaldun, declared that state hospitals are overwhelmed, and there are no signs that the rate of infection is slowing down.[18]

6.      Accordingly, medical experts have stressed that urgent action to reduce jail populations is an essential public health priority to avoid further straining regional hospitals and health centers—which would bear the brunt of having to treat all infected people. As a result, regional hospitals and health centers would have fewer resources available to treat individuals seeking care, which will prove

---

[15] *See TCF Center makeshift hospital in Detroit ready to accept first patients*, WXYZ Detroit, Channel 7 (Apr. 9, 2020) https://www.wxyz.com/news/coronavirus/4-local-health-systems-will-help-staff-tcf-center-temporary-hospitals-first-patients-arriving-friday.

[16] *See* Paul P. Murphy, *Detroit hospital workers say people are dying in the ER hallways before help can arrive* (Apr. 9, 2020), https://www.cnn.com/2020/04/09/us/detroit-hospital-workers-sinai-grace-coronavirus/index.html.

[17] *Id.*

[18] Courtney Vinopal, *WATCH: Michigan Gov. Gretchen Whitmer gives coronavirus update*, PBS (Apr. 6, 2020), https://www.pbs.org/newshour/health/watch-livemichigan-gov-gretchen-whitmer-gives-coronavirus-update.

5

disastrous when medical needs overwhelm the institutions' resources.[19]

7.     Recognizing the immediate need to slow the spread of this virus and protect public health, medical experts have urged people to practice sweeping precautionary measures in their everyday lives. Yet the very steps required for all of those living outside of a jail—regular handwashing, adequately cleaning their surroundings, access to testing, prompt medical attention, and wearing protective gear—have been made impossible for those confined in the Jail by the very officials responsible for their well-being.

8.     Social distancing, the practice of maintaining at least six feet between any two people, is the single most important precaution anyone can take to prevent the spread of COVID-19. Governors, mayors, and local city and county officials have all urged the public to practice social distancing.[20] Forty-six states and the

---

[19] Ex. 1, Declaration of Marc Stern ("Stern Decl.") ¶ 11; *see also* Ex. 2, Expert Declaration of Dr. Jaimie Meyer ("Meyer Decl.") ¶¶ 16, 22, *Velesaca v. Wolf*, Case No. 1:20-cv-01803-AKH, ECF Doc. 42 (S.D.N.Y. Mar. 16, 2020); Ex. 3, Expert Declaration of Elizabeth Y. Chiao ("Chiao Decl.") ¶ 28, *Russell, et al. v. Harris County, Texas*, No. 4:19-cv-00226, ECF Doc. 32-2 (S.D. Tex. Mar. 27, 2020).

[20] *Michigan closes bars, stops restaurant dine-in, further limits gatherings*, WOODTV (Mar. 16, 2020), https://www.woodtv.com/health/coronavirus/whitmer-orders-bars-restaurants-to-close-due-to-virus-concerns/; Doug Mainwaring, *Governor urges 'social distancing' even among families at home*, LifeSite (Apr. 3, 2020), https://www.lifesitenews.com/news/governor-urges-social-distancing-even-among-families-at-home; Christian Berthelsen, Elise Young, *N.J., N.Y. Urge Residents to Stay Put With Peak Approaching*, Bloomberg (Apr. 9, 2020), https://www.bloomberg.com/news/articles/2020-04-09/murphy-says-social-distancing-is-slowing-virus-spread-in-n-j; Laura Ziegler, *Act Like You Have The Virus, Kansas City Officials Urge As They Step Up Social Distance Enforcement*,

District of Columbia have ordered all businesses deemed nonessential to close.[21]

Three hundred sixteen million people in at least 42 states, three counties, nine cities,

the District of Columbia, and Puerto Rico are being urged (or ordered) to stay

home.[22] Gatherings where it is impossible to maintain social distancing have been

cancelled across the country and the world.[23] In several states, police are arresting

or ticketing people who fail to maintain six feet of separation between themselves

and others.[24]

---

KCUR (Mar. 30, 2020), https://www.kcur.org/post/act-you-have-virus-kansas-city-officials-urge-they-step-social-distance-enforcement#stream/0; Kendall Downing, *City, county officials urge social distancing over Easter holiday weekend; City braces for COVID-19 budget impact*, WMC5 (Apr. 8, 2020), https://www.wmcactionnews5.com/2020/04/08/city-county-officials-urge-social-distancing-over-easter-holiday-weekend-city-braces-covid-budget-impact/; *Many People Will Get COVID-19' Says Mayor Garcetti As He Urges LA To Practice Social Distancing, Self-Quarantine*, CBSN Los Angeles (Mar. 14, 2020), https://losangeles.cbslocal.com/2020/03/14/many-people-will-get-covid-19-says-mayor-garcetti-as-he-urges-la-to-practice-social-distancing-self-quarantine/.

[21] Eric Schumaker, *Here are the states that have shut down nonessential businesses*, ABC News, (Apr. 3, 2020), https://abcnews.go.com/Health/states-shut-essential-businesses-map/story?id=69770806.

[22] Sarah Mervosh, Denise Lu & Vanessa Swales, *See Which Cities and States Have Told Residents to Stay at Home*, N.Y. Times (Apr. 20, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[23] *A List of What's Been Canceled Because of the Coronavirus*, N.Y. Times (Apr. 1, 2020), https://www.nytimes.com/article/cancelled-events-coronavirus.html.

[24] Hannah Fry, *Manhattan Beach issues 129 citations for coronavirus social-distancing*, L.A. Times (Apr. 7, 2020), https://www.latimes.com/california/story/2020-04-07/manhattan-beach-citations-coronavirus-social-distancing-violations; *Detroit police: Property owners will get*

9.     Wayne County and the officials responsible for operating the Wayne County Jail have failed to adequately respond to the obvious and urgent threats posed by this growing pandemic. Contrary to public claims, the people detained inside have limited and, at times no access to soap, cleaning supplies, or personal protective equipment, Kleenex, and paper towels; they sparingly receive clean clothing, linens, and towels; in many cases, they sleep and eat within a couple of feet and, at times, inches of one another; they must wait days to receive medical attention; and, frequently, requests for medical attention are dismissed or punished.

10.     The population reduction in the jail is insufficient, and the approximately 850 people held inside are forced to suffer unconstitutional conditions that blatantly deny them adequate medical care as well as the most basic protections necessary to mitigate the spread and risk of infection.

11.     Most notably, however, the Wayne County Jail's population of

---

*social distancing violation ticket if crowd gathers*, Fox 2 (Apr. 6, 2020), https://www.fox2detroit.com/news/detroit-police-property-owners-will-get-social-distancing-violation-ticket-if-crowd-gathers; Katie Canales, *Police in California have started ticketing people having picnics and congregating in beach areas as law enforcement cracks down on violators of the statewide stay-at-home order*, Business Insider (Apr. 6, 2020), https://www.businessinsider.com/california-giving-people-tickets-stay-at-home-coronavirus-2020-4; Amanda Jackson, *Police are arresting and fining people for violating social distancing orders*, CNN (Apr. 1, 2020), https://www.cnn.com/2020/03/31/us/violating-coronavirus-orders-trnd/index.html. Alice Speria, *NYPD's Aggressive Policing Risks Spreading The Coronavirus*, The Intercept (Apr. 3, 2020), https://theintercept.com/2020/04/03/nypd-social-distancing-arrests-coronavirus/.

approximately 850 people makes it impossible to implement the single most effective weapon against the risk of infection, absent a vaccine: social distancing.

12.    Public health experts agree that all of the aforementioned protective measures are insufficient to contain the virus if social distancing cannot be achieved. Infectious disease physician, virologist, and associate professor Adam Lauring emphasized, "[i]f social distancing cannot meaningfully be practiced, then it is impossible to prevent the spread of infections."[25] Infectious disease physician Carlos Franco-Paredes, M.D., echoes Dr. Lauring's sentiments, "unless social distancing is…meaningfully implemented," protective "interventions are insufficient to interrupt the transmission of COVID-19."[26] In accord with "U.S. public health experts," National Institutes of Health Director Dr. Francis Collins, similarly remarked, "what we need most right now to slow the stealthy spread of this new coronavirus is a full implementation of social distancing."[27] And UC San Francisco epidemiologists Jeff Martin, MD, MPH, and George Rutherford, III, MD, make clear, "[s]ocial distancing is currently the most important factor we can control in the COVID-19 outbreak, and therefore critical" to "avoid catching the virus yourself

---

[25] Ex. 14, Declaration of Dr. Adam Lauring ("Lauring Decl.") ¶ 13.

[26] Ex. 6, Report of Dr. Carlos Franco-Paredes, p. 1.

[27] Dr. Francis Collins, *To Beat COVID-19, Social Distancing is a Must*, NIH Director's Blog (Mar. 19, 2020), https://directorsblog.nih.gov/2020/03/19/to-beat-covid-19-social-distancing-is-a-must/.

and avoid passing it on."[28]

13.     People confined in jails and prisons must "be furnished with the basic human needs, one of which is 'reasonable safety,'" *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) (citations omitted). Yet Plaintiffs, as well as the class and subclass they represent, all face imminent risk of serious injury or death from a COVID-19 outbreak in the Wayne County Jail. In the midst of a public health crisis, the people confined at the Wayne County Jail have not been provided adequate safeguards against the severe threat of this novel coronavirus.

14.     Because Defendants' actions (and failure to act) constitute ongoing, systemic violations of Petitioner/Plaintiffs' constitutional rights, Petitioners/Plaintiffs seek class-wide relief requiring Defendants to take basic and necessary steps to protect the health and welfare of people held inside of the jail, who, due to the nature of their confinement, are both at heightened risk of infection and death and unable to enjoy the most basic necessary protections which are routinely practiced by people outside of the jail. Petitioners/Plaintiffs further request a writ of habeas corpus for all those who are medically vulnerable and at particularly grave risk of infection and death from COVID-19—all they ask is to be treated

---

[28] Nina Bai, *Why Experts Are Urging Social Distancing to Combat Coronavirus Outbreak*, Univ. of Cal. S.F. (Mar. 14, 2020), https://www.ucsf.edu/news/2020/03/416906/why-experts-are-urging-social-distancing-combat-coronavirus-outbreak.

humanely during this perilous time.

## JURISDICTION AND VENUE

15.     This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2241, and 28 U.S.C. § 2201, *et seq*., as well as the Eighth and Fourteenth Amendments to the United States Constitution. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, 28 U.S.C. § 2241, and 28 U.S.C. § 1651.

16.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this judicial district.

## PARTIES

17.     Petitioner/Plaintiff Charles Russell, a 59 year old Black man, currently resides in Wayne County, Michigan. At all times relevant to this Complaint, Mr. Russell was in the custody of the Defendants, in their official capacities, at the Wayne County Jail. He is currently confined in Division III of the Jail. Mr. Russell suffers from stage 3 prostate cancer, diabetes, high blood pressure, and an umbilical hernia. Since being taken into custody on March 20, 2020, Mr. Russell has been unable to attend any radiation treatment sessions, which he must receive five times per week to prevent his cancer from spreading. He represents the Class and the medically vulnerable subclass.

18.    Petitioner/Plaintiff Christopher Hubbard, a 26 year old Black man, currently resides in Wayne County, Michigan. At all times relevant to this Complaint, Mr. Hubbard was in the custody of the Defendants, in their official capacities, at the Wayne County Jail. He is currently confined in Division III of the Jail. Mr. Hubbard has diabetes and asthma. He is expecting a baby with his partner in October 2020. He represents the Class, as well as the pretrial and medically vulnerable subclasses.

19.    Petitioner/Plaintiff Harry White, a 36 year old Black man, currently resides in Wayne County, Michigan. Mr. White is the father of four children and is expecting a new baby with his fiancé this fall. At all times relevant to this Complaint, Mr. White was in the custody of the Defendant, in their official capacities, at the Wayne County Jail. He is currently confined in Division III of the Jail. Mr. White suffers from a heart murmur and localized paralysis in his feet and hands and chronic pain from a bullet located on his spine. He has had to relearn to walk and is unable to stand for long periods of time. He represents the Class, as well as the post-conviction and medically vulnerable subclasses.

20.    Petitioner/Plaintiff Carl Smelley, a 38 year old Black man, currently resides in Wayne County, Michigan. At all times relevant to this Complaint, Mr. Smelley was in the custody of the Defendants, in their official capacities, at the Wayne County Jail. He is currently confined in Division II of the Jail. Mr. Smelley

suffers from Sickle Cell Disease, hypertension, and diabetes. He represents the Class and the medically vulnerable subclass.

21.　Petitioner/Plaintiff CalDerone Pearson, a 30 year old Black man, currently resides in Wayne County, Michigan. Mr. Pearson is the father of five young children who rely on his care. At all times relevant to this Complaint, Mr. Pearson was in the custody of the Defendants, in their official capacities, at the Wayne County Jail. He is currently confined in Division III of the Jail. He represents the Class and the post-conviction subclass.

22.　Petitioner/Plaintiff Shane Carline, a 33 year old White man, currently resides in Wayne County, Michigan and is recently married. At all times relevant to this Complaint, Mr. Carline was in the custody of the Defendants, in their official capacities, at the Wayne County Jail. He is currently confined in Division II of the Jail because he cannot afford to pay his bond. He is awaiting trial and is presumptively innocent. He represents the Class and the pretrial subclass.

23.　Petitioner/Plaintiff Courtney White, a 54 year old Black man, currently resides in Wayne County, Michigan. At all times relevant to this Complaint, Mr. White was in the custody of the Defendants, in their official capacities, at the Wayne County Jail. He is currently confined in Division III of the Jail. Mr. White suffers from high blood pressure and high cholesterol. He represents the Class, as well as the post-conviction and medically vulnerable subclasses.

24.     Defendant Wayne County is a political subdivision of the State of Michigan that can be sued in its own name. Wayne County is responsible for all acts of the Wayne County Sheriff's Office. The Wayne County Sheriff's Office oversees the Jail and is responsible for the custody and care of all persons detained or incarcerated in the Jail, and it currently has immediate custody over Petitioners/Plaintiffs and other putative class members.

25.     Defendant Benny Napoleon is the Sheriff for Wayne County and is responsible for operating the Jail and maintaining the care and custody of people confined at the Jail. Defendant Napoleon is being sued in his official capacity.

26.     Defendant Robert Dunlap is the Chief of Jails and Court Operations and is responsible for operating the Jail and maintaining the care and custody of people confined at the Jail. Defendant Dunlap is being sued in his official capacity.

27.     Defendant James E. Davis is the Deputy Chief of Jail Operations and is responsible for operating the Jail and maintaining the care and custody of people confined at the Jail. Defendant Davis is being sued in his official capacity.

28.     Defendant Daniel Pfannes is the Undersheriff for the Wayne County Sheriff's Office and is responsible for operating the Jail and maintaining the care and custody of people confined at the Jail. Defendant Pfannes is being sued in his official capacity.

14

## THE GRAVE RISK OF HARM POSED BY THE COVID-19 PANDEMIC REQUIRES AN EMERGENCY RESPONSE

29.     The highly contagious novel coronavirus, and its resulting infection, COVID-19, are spreading at an alarming rate. Emphasizing "deep[] concern[] both by the alarming levels of spread and severity, and by the alarming levels of inaction," the World Health Organization has called for countries to take "urgent and aggressive action."[29]

30.     The virus is transmitted through respiratory droplets or contact with surfaces on which the virus is present.[30] Recent studies show that more than 50% of infected persons may never show symptoms, but can, nevertheless, transmit the virus to others.[31] As a result, confirmed cases of the virus are likely drastically understated.

31.     Dr. Amir Moheb Mohareb, an expert in infectious diseases, explains

---

[29] *See* World Health Organization, Director-General Opening Remarks (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-mediabriefing-on-covid-19---11-march-2020; *see also Coronavirus: COVID-19 Is Now Officially A Pandemic*, *WHO Says*, NPR (Mar. 11, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/11/814474930/coronavirus-covid-19-is-now-officially-a-pandemic-who-says.

[30] *See* World Health Organization, *Modes of transmission of virus causing COVID-19: implications for IPC precaution recommendations* (Mar. 29, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations.

[31] Katherine Harmon Courage, *How people are spreading Covid-19 without symptoms*, Vox, (Apr. 22, 2020) https://www.vox.com/2020/4/22/21230301/coronavirus-symptom-asymptomatic-carrier-spread.

that COVID-19 can be spread through airborne or aerosolized transmission and that "various particles in small respiratory droplets that are emitted by an infected person can remain suspended in the air and remain infective over several hours and over long distances."[32] He continues, "[p]athogens that travel via airborne transmission can infect persons even if they are wearing surgical or procedural masks." Buildings or facilities that do not have negative-pressure ventilation may be at risk of spreading aerosolized pathogens between rooms. Furthermore, "[a]erosols can be generated by a number of common events, including vigorous coughing, sneezing, use of certain nasal sprays or nebulizer treatments, and toilet flushing."[33] There is further reason to believe that SARS-CoV-2 can be transmitted via fecal-oral contact and that the identification of viable SARS-CoV-2 in stool of infected persons raises concern of airborne transmission via toilet flushing."[34] Finally, he declares, "[h]and hygiene and the provision of surgical masks are insufficient to prevent the spread of infection in a congregate setting."[35]

32. The number of people infected by COVID-19 is growing

---

[32] Ex. 16, Expert Declaration of Dr. Amir Moheb Mohareb ("Mohareb Decl.") ¶ 7, *Mays v. Dart*, Case No. 20-cv-2134 (Apr. 3, 2020).

[33] *Id.*

[34] *Id.*

[35] *Id.*

exponentially.[36] On January 1, 2020, the first confirmed COVID-19 case was diagnosed in the United States.[37] As of May 2, 2020, there were more than 1,092,000 confirmed COVID-19 cases and more than 64,000 deaths in the United States.[38] Nationally, CDC projections indicate that over 200 million individuals in the United States could be infected with COVID-19 without effective public health intervention over the course of the pandemic,[39] and as many as 2.2 million deaths in the worst projections.[40]

33.   The virus poses a grave risk of severe illness, including lung tissue damage, sometimes leading to a permanent loss of respiratory capacity. It can also

---

[36] The death toll in Italy, which began experiencing this epidemic about a week earlier than the first diagnosed American case, saw a rise of 30% overnight in the 24 hours between March 5, 2020, and March 6, 2020 and a rise of 25% on March 15 alone—a day that killed 368 people in Italy. *See* Crispian Balmer & Angelo Amante, *Italy coronavirus deaths near 200 after biggest daily jump*, Reuters (Mar. 6, 2020), https://www.reuters.com/article/us-health-coronavirus-italy/italy-coronavirus-deaths-near-200-after-biggest-daily-jump-idUSKBN20T2ML.

[37] Derrick Bryson Taylor, *A Timeline of the Coronavirus*, N.Y. Times (Mar. 2020), https://www.nytimes.com/article/coronavirus-timeline.html (last visited Mar. 24, 2020).

[38] *Coronavirus 2019*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/cases-in-us.html.

[39] James Glanz et al., *Coronavirus Could Overwhelm U.S. without Urgent Action, Estimates Say*, N.Y. Times (Mar. 20, 2020), https://www.nytimes.com/interactive/2020/03/20/us/coronavirus-model-us-outbreak.html.

[40] Holly Yan, *More than 3,000 people in the US have died from coronavirus*, CNN (Mar. 31, 2020), https://www.cnn.com/2020/03/30/health/us-coronavirus-updatesmonday/index.html.

cause acute respiratory distress syndrome, affect cardiac functions (including the possibility of heart failure), lead to severe damage to other organs (including causing irreversible harm to the kidneys or neurologic injury),[41] and cause life-threatening blood clots.[42] Research also suggests that COVID-19 can trigger an over-response in the immune system,[43] resulting in death.[44] People over the age of 50 are particularly at risk (accounting for 74% of patients hospitalized), as are people with certain underlying conditions, most commonly, hypertension, obesity, chronic lung disease, diabetes mellitus, and cardiovascular disease.[45]

34. The experiences of persons infected with COVID-19 are "a lot more frightening" than the flu.[46] Suffering from acute respiratory distress syndrome has

---

[41] Ex. 4, Expert Decl. of Jonathan Louis Golob ("Golob Decl.") ¶ 7.

[42] Lydia Ramsey, *Blood clots are the latest life-threatening complication of the coronavirus, but doctors aren't sure how to treat them*, Business Insider (Apr. 19, 2020), https://www.businessinsider.com/coronavirus-blood-clot-complications-in-severe-covid-19-treatment-debate-2020-4.

[43] *Id.*

[44] Ex. 4, Golob Decl. ¶ 7.

[45] Centers for Disease Control & Prevention, Morbidity and Mortality Weekly Report – Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Cases (Apr. 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm.

[46] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, Propublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

been compared to "essentially drowning in [one's] own blood."[47] Even relatively young people with few health problems can be "wiped out" by the virus, "like they've been hit by a truck," and, in some cases, "sudden[ly]" go into complete respiratory failure.[48]

35.     Further, because COVID-19-related complications can develop rapidly, local hospitals are overwhelmed with high patient volumes and shortages in health care resources. Treatment for severe COVID-19 cases requires advanced medical support with highly specialized equipment, such as ventilators and oxygen assistance, and a team of qualified health care providers.

36.     The current estimated incubation period is between 2 and 14 days.[49] Approximately 20% of people infected experience life-threatening complications, and, of those infected, between 1% and 3.4% die.[50] According to recent estimates, the fatality of people infected with the coronavirus is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health

---

[47] *Id.*

[48] *Id.*

[49] Centers for Disease Control & Prevention, *Coronavirus Disease COVID-19 Symptoms* (updated: Feb. 29 2020), https://www.cdc.gov/coronavirus/2019-ncov/about/symptoms.html.

[50] Brian Resnick & Christina Animashaun, *Why Covid-19 is worse than the flu, in one chart*, Vox (Mar. 18, 2020), https://www.vox.com/science-and-health/2020/3/18/21184992/coronavirus-covid-19-flu-comparison-chart.

care systems.[51] Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage and loss of respiratory capacity.[52]

37.     Because it is unclear whether people who have recovered from COVID-19 are immune to reinfection,[53] and a vaccine appears more than one year away, the only effective weapon against the virus is preventing new infections. According to health experts, the *only* guaranteed way to prevent new infections, is social distancing: physically isolating oneself from any other person at a minimum distance of six feet. Dozens of the world's experts on fighting epidemics agree that extreme social distancing approximates the type of "total freeze"[54] on transmission that is vital to halting and reversing the spread of COVID-19. Epidemiologists say that "[i]f it were possible to wave a magic wand and make all Americans freeze in place for

---

[51] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, Wall St. J. (Mar. 10, 2020), https://www.wsj.com/articles/coronavirus-vs-flu-which-virus-is-deadlier-11583856879.

[52] Ex. 4, Golob Decl. ¶ 4.

[53] Dr. Delaram J. Taghipour, *Questions Remain Over Whether COVID-19 Recovery Will Guarantee Immunity: Is Reinfection Still Possible*, ABC News (Apr. 12, 2020), https://abcnews.go.com/Health/questions-remain-covid-19-recovery-guarantee-immunity-reinfection/story?id=70085581.

[54] Donald G. McNeil Jr., *The Virus Can Be Stopped, but Only With Harsh Steps, Experts Say*, N.Y. Times (Mar. 22, 2020), https://www.nytimes.com/2020/03/22/health/coronavirus-restrictions-us.html.

14 days while sitting six feet apart . . . the whole epidemic would sputter to a halt."[55]

## INCARCERATED PEOPLE AND CORRECTIONAL STAFF ARE AT HEIGHTENED RISK DURING THE COVID-19 PANDEMIC

38.    Jail facilities become "ticking time bombs" in a pandemic, as "[m]any people crowded together, often suffering from diseases that weaken their immune systems, form a potential breeding ground and reservoir for diseases."[56] Epidemiological research overwhelmingly "shows that mass incarceration raises contagion rates for infectious disease—both for people in jails, and for the community at large."[57]

39.    These facilities are inextricably linked to public life: staff, visitors, contractors, and vendors pass between communities and these facilities multiple times daily, and, if infected, carry the virus with them. Similarly, rapid turnover of jail and prison populations means that people often cycle between these facilities and communities. Thus, the ability to control the spread of infection outside of facilities hinges on controlling infection and the spread of infection *inside* of these

---

[55] Donald G. McNeil Jr., *The Virus Can Be Stopped, but Only With Harsh Steps, Experts Say*, N.Y. Times (Mar. 22, 2020), https://www.nytimes.com/2020/03/22/health/coronavirus-restrictions-us.html.

[56] *See* St. Louis Univ., *"Ticking Time Bomb": Prisons Unprepared For Flu Pandemic*, ScienceDaily (2006), https://www.sciencedaily.com/releases/2006/09/060915012301.htm.

[57] Sandhya Kajeepeta & Seth J. Prins, *Why Coronavirus in Jails Should Concern All of Us*, The Appeal (Mar. 24, 2020), https://theappeal.org/coronavirus-jails-public-health/.

facilities. Put simply, jail health is public health.

40.     According to Dr. Jaimie Meyer, an expert in public health in jails and prisons: "[T]he risk posed by COVID-19 in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected."[58] This is due to a number of factors, including:

     a.  The close proximity of individuals in those facilities;

     b.  Their reduced ability to protect themselves through social distancing;

     c.  The lack of necessary medical and hygiene supplies ranging from hot water, soap or hand sanitizer, to protective equipment;

     d.  Ventilation systems that encourage the spread of airborne diseases;

     e.  Difficulties quarantining individuals who become ill;

     f.  The enhanced susceptibility of the population in jails and prisons due to chronic health conditions;

     g.  The fact that incarcerated people, rather than professional cleaners, are often responsible for cleaning the facilities and are not given appropriate supplies; and

     h.  The fact that jails and prisons normally have to rely heavily on outside hospitals that will become unavailable during a pandemic, as well as the loss of both medical and correctional staff to illness.[59]

---

[58] Ex. 2, Meyer Decl. ¶ 7, ECF Doc. 42, *Velesaca v. Wolf*, Case No. 1:20-cv-01803-AKH (S.D.N.Y. Mar. 16, 2020).

[59] *See* Ex. 2, Meyer Decl. ¶¶ 7-19; *Pandemic Influenza & Jail Facilities & Populations*, Am. J. of Pub. Health, October 2009 ("The pathway for transmission of pandemic influenza between jails and the community is a two-way street. Jails process millions of bookings per year. Infected individuals coming from the community may be housed with healthy inmates and will come into contact with

41.     Increased risk of transmission and infection also result from the constant cycling of people in and out of the jail (including staff),[60] limited access to medical care within the Jail itself, and ineffective screening procedures. Most people do not show symptoms for two to fourteen days while being contagious. Others never exhibit any symptoms at all. Thus, while screening for fevers and other symptoms associated with COVID-19 may stop *some* infected people from entering or transmitting the disease, it cannot catch many of those actively spreading the virus. The drastic social distancing measures that have been imposed across the country are designed to combat this exact problem. To be sure, by staying at home, we can limit our contact with other persons, even the asymptomatic. This option is unavailable in the Jail.

42.     Any of the revolving door of Jail staff can be asymptomatically carrying and transmitting COVID-19, and the Jail has no means of stopping the spread of this disease. In Michigan, more than 40 state Department of Corrections staff have

_____

correctional officers, which can spread infection throughout a facility."). *See also* Dr. Anne Spaulding, Coronavirus and the Correctional Facility: for Correctional Staff Leadership, Mar. 9, 2020, *available at* https://www.ncchc.org/filebin/news/COVID_for_CF_Administrators_3.9.2020.pdf .

[60] *See* Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform*, Prison Policy Initiative (Mar. 6, 2020), https://www.prisonpolicy.org/blog/2020/03/06/pandemic.

contracted COVID-19, and an additional 150 staff have self-quarantined due to possible exposure.[61] On April 2, 2020, Andy Potter, Executive Director of the Michigan Corrections Organization, and Brian Dawe**,** Executive Director of the American Correctional Officer Intelligence Network, sent a letter to the National Governors Association, describing the dire impact of COVID-19 on correctional officers and staff: "[O]fficers in Michigan, New York and New Jersey have died from COVID-19. They will not be the last. Hundreds more across the nation have tested positive and thousands face quarantine. Detainees in our custody are dying as a result of this virus."[62] The letter also referenced a survey of over 750 correctional officers and staff about the ways in which the COVID-19 virus is impacting prisons, jails, and juvenile detention facilities, in which almost 60% of respondents said that COVID-19-related hazards inside their facility remain unaddressed.[63] Correctional officials around the country agree that particular care must be taken to stop the spread of COVID-19 within the nation's jails. Leann Bertsch, the Director of the North Dakota Department of Corrections and Rehabilitation, concluded that,

---

[61] Jameson Cook, *Michigan prison guards concerned about dangers of COVID-19*, Macomb Daily (Apr. 5, 2020),
https://www.macombdaily.com/news/coronavirus/michigan-prison-guards-concerned-about-dangers-of-covid-19/article_1e6c27f6-7604-11ea-a444-43bddcfab230.html.

[62] Letter from One Voice & ACOIN to Nat'l Governors Ass'n (Apr. 2, 2020), https://drive.google.com/file/d/13euHXAPbSyVo1vkG9k1x7ymJCl_UJhTc/view.

[63] *Id*.

"ignoring the health of those living and working inside the walls of our nation's correctional facilities poses a grave threat to us all," and that "putting public health first is the best, and only, way to effectively achieve [a department of correction's] public safety mission during the COVID-19 pandemic."[64]

43.     On March 30, 2020, the Centers for Disease Control and Prevention (CDC) published guidance for correctional and detention facilities, including local jails.[65] The CDC recognized that incarcerated people must exist "within congregate environments" that "heighten[] the potential for COVID-19 to spread once introduced."[66] Indeed, "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility" including "daily staff ingress and egress…transfer of incarcerated/detained persons between facilities and systems, to court appearances," as well as "high turnover" of "admit[ted] new entrants."[67] Accordingly, the CDC recommends that correctional facilities:

> a. Post signage throughout the facility communicating COVID-19

---

[64] Brie Williams & Leanne Bertsch, *A public health doctor and head of corrections agree: we must immediately release people from jails and prisons*, The Appeal (Mar. 27, 2020), https://theappeal.org/a-public-health-doctor-and-head-of-corrections-agree-we-mustimmediately-release-people-from-jails-and-prisons/.

[65] Ex. 7, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control & Prevention (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidancecorrectional-detention.html.

[66] *Id*.

[67] *Id*.

symptoms and hand hygiene instructions, ensure such signage is understandable for non-English speaking people as well as those with low literacy, and provide clear information about the presence of COVID-19 cases within a facility and the need to increase social distancing and maintain hygiene precautions;

b.  Ensure that sufficient stocks of hygiene supplies are on hand and available, and have a plan in place to restock as needed. Provide a no-cost supply of and access to soap to incarcerated/detained persons, sufficient to allow frequent hand washing. Provide Liquid soap when possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing. Provide hand drying supplies, and alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions);

c.  Provide running water, hand drying machines or disposable paper towels for hand washing, and tissues (providing no-touch trash receptacles for disposal);

d.  Ensure that sufficient stocks of cleaning supplies are on hand and available, and have a plan in place to restock as needed, including issues, cleaning supplies, including EPA-registered disinfectants effective against the virus that causes COVID-19;

e.  Ensure that sufficient stocks of PPE and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs within the facility, including standard medical supplies for daily clinic needs, and recommended PPE (facemasks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls);

f.  Consider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting where security concerns allow. Consider allowing staff to carry individual-sized bottles for their personal hand hygiene while on duty;

g.  Suspend co-pays for incarcerated people seeking medical evaluation for respiratory symptoms;

h. Even if COVID-19 cases have not been identified locally or inside, implement "intensified cleaning and disinfecting procedures" that clean and disinfect high-touch surfaces and objects "[s]everal times per day," and ensure adequate supplies to support intensified cleaning and disinfection practices";

i. Perform pre-intake screening and temperature checks for all new entrants, and implement daily temperature checks in housing units where COVID-19 cases have been identified;

j. If an individual has symptoms of COVID-19 (fever, cough, shortness of breath), require the individual to wear a face mask and place her under medical isolation; and

k. Implement social distancing strategies to increase the physical space between incarcerated people, ideally a distance of six feet "regardless of the presence of symptoms."

44.    The CDC's guidance for jail administrators, however, is not a substitute for what is medically required to protect people's lives during a pandemic. Nor is it a repudiation of the CDC's scientific guidance that social distancing is required to stop the transmission of the virus.

45.    The global path of the virus proves that jails and prisons are epicenters for transmission. Approximately one month into the pandemic in the province of Hubei, China, over half of reported COVID-19 cases were from jails.[68] In South Korea, which has had tremendous success in slowing and stopping the spread of the virus, "the single largest COVID-19 outbreak and mortality cluster was from the

---

[68] Zi Yang, *Cracks in the System: COVID-19 in Chinese Prisons*, The Diplomat (Mar. 9, 2020), https://thediplomat.com/2020/03/cracks-in-the-system-covid-19-in-chinese-prisons/.

Daenam Prison Hospital, where 101 detainees were infected and seven died."[69]

46.    The coronavirus has started spreading inside other prisons, jails, and detention centers in the United States. Experts predict that a mass contagion is only a matter of time and that "[a]ll prisons and jails should anticipate that the coronavirus will enter their facility."[70]

47.    Once the virus enters a jail or prison, the infection rate has been known to far exceed that of the broader community. In mid-March, for example, the jail at Rikers Island in New York City had not had a single confirmed COVID-19 case. By March 30, 167 detainees, 114 correction staff and 20 health workers at Rikers tested positive for COVID-19; two correction staff members had died and multiple detainees had been hospitalized. Rikers now has a rate of infection that is nearly seven times higher than that in New York City and nine times higher than the rate in

---

[69] Nancy Gertner & John Reinstein, *Compassionate Release Now for Prisoners Vulnerable to the Coronavirus*, Boston Globe (Mar. 23, 2020), https://www.bostonglobe.com/2020/03/23/opinion/compassionate-release-now-prisoners-vulnerable-coronavirus/.

[70] Evelyn Cheng & Huileng Tan, *China Says More than 500 Cases of the New Coronavirus Stemmed from Prisons*, CNBC (Feb. 20, 2020), https://www.cnbc.com/2020/02/21/coronavirus-china-says-twoprisons-reported-nearly-250-cases.html (quoting Tyler Winkelman, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research Institute in Minneapolis).

New York State[71]; over 30 times higher than the rest of America; and far higher than the infection rates of the most infected regions of the world.[72] More than 700 people have tested positive for Covid-19, including more than 400 staff.[73] The Chief Medical Officer of Rikers has described COVID-19 infections as a "public health disaster unfolding before our eyes." *Id*. In his view, following CDC guidelines has not been enough to stem the crisis: "infections in our jails are growing quickly despite these efforts."[74]

48.    The Cook County Jail, similarly, went from two confirmed COVID-19 cases on March 23 to more than 350 confirmed cases, 238 detainees and 115 staff members, two weeks later.[75] Approximately one month later, cases have more than

---

[71] Asher Stockler, *More Than 700 People Have Tested Positive for Coronavirus on Rikers Island, Including Over 440 Staff*, Newsweek (May 4, 2020), https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872.

[72] *COVID-19 Infection Tracking in NYC Jails*, The Legal Aid Society (updated May 1, 2020), https://legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/ (last visited May 3, 2020).

[73] *See* Jan Ransom, *We're Left for Dead: Fears of Virus Catastrophe at Rikers Jail*, N.Y. Times, (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html.

[74] Ross MacDonald (@RossMacDonaldMD), Twitter (Mar. 30, 2020, 8:03 PM), https://twitter.com/rossmacdonaldmd/status/1244822686280437765?s=12 ("I can assure you we were following the CDC guidelines before they were issued. We could have written them ourselves. . . [I]infections in our jails are growing despite these efforts.").

[75] Timothy Williams & Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars*, N.Y. Times (Apr. 8, 2020),

doubled, 448 detainees and 300 jail staff have contracted COVID-19, and six detainees have died as a result.[76] Nurses at Cook County's Stroger Hospital have warned that the virus is a "growing beast" that threatens not only staff and people behind bars but all of Cook County.[77] An entire unit at Stroger Hospital has been converted into a space for treating COVID-19 cases from the Cook County jail, and the unit is rapidly reaching maximum capacity.[78]

49.     An equally gruesome pattern is already devastating Michigan's carceral system.[79] In one Michigan prison alone, 10% of all incarcerated people have tested positive for COVID-19, and 9 prisoners have already died statewide.[80] As of May 2, there were 1412 confirmed cases among people detained in Michigan's prisons, an

---

https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.

[76] Andy Grimm, *Cook County Jail director defends handling of COVID-19 outbreak*, Chi. Sun Times, (Apr. 23, 2020), https://chicago.suntimes.com/coronavirus/2020/4/23/21233570/cook-county-jail-covid-19-outbreak-tom-dart.

[77] Shannon Heffernan, *Nurses Warn COVID-19 Cases At Cook County Jail Aren't Just Staying Behind Bars*, WBEZ, Chicago's NPR (Apr. 11, 2020), https://www.wbez.org/stories/nurses-warn-covid-19-cases-at-cook-county-jail-arent-just-staying-behind-bars/44cc1e46-693b-44cc-8a5a-347737966185.

[78] *Id.*

[79] *See* Angie Jackson & Kristi Tanner, *Infection Rate at Michigan Prison Exceeds New York, Chicago Hot Spots*, Detroit Free Press (Apr. 15, 2020), https://www.freep.com/story/news/local/michigan/2020/04/16/infection-rate-michigan-prison-exceeds-new-york-chicago-jail-hotspots/2987935001/.

[80] *Id.*

increase of almost 1100 cases since April 12.[81] And 175 prison staff also had

confirmed cases on April 15. There have also been numerous outbreaks in

Michigan's jails, including in all three counties in the Detroit metropolitan area.[82]

50.    For this reason, medical and public health experts have urged

emergency action to fight the spread of COVID-19 in jails and other carceral

facilities, including decarceration, improved access to medical care, compliance with

CDC guidelines, and more.[83] Medical experts explain that the need for action is

urgent given that "[t]he window of opportunity is rapidly narrowing for mitigation

of COVID-19"—outbreaks are measured "in a matter of days, not weeks," with this

---

[81]Steve Neavling, *Nearly half of the inmates tested in Michigan prisons have coronavirus*, Metro Times (May 2, 2020), https://www.metrotimes.com/news-hits/archives/2020/04/30/nearly-half-of-the-inmates-tested-in-michigan-prisons-have-coronavirus.

[82] *See* Ross Jones, *Michigan Prisons and Jails See COVID-19 Cases Rise*, WXYZ Channel 7 News (Apr. 3, 2007), https://www.wxyz.com/news/local-news/investigations/michigan-prisons-and-jails-see-covid-19-cases-rise.

[83] *See, e.g.,* Ex. 4, Brad Lander, *Doctors in NYC Hospitals, Jails, and Shelters Call on the City to Take More Aggressive Action to Combat the Spread of Coronavirus, Medium* (Mar. 12, 2020), https://medium.com/@bradlander/doctors-in-nyc-hospitals-jails-and-shelters-call-on-the-city-totake-more-aggressive-action-to-fb75f0b131c2; Ex. 8, Letter from Johns Hopkins faculty to Governor Hogan, Mar. 25, 2020, https://bioethics.jhu.edu/wp-content/uploads/2019/10/JohnsHopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf; Ex. 1, Stern Decl. ¶ 11, ECF Doc. 6, *Dawson v. Asher*, Case No. 2:20-cv-00409-JLR-MAT (D. Or. Filed March 16, 2020); Ex. 10, Declaration of Dr. Ranit Mishori ("Mishori Decl.") ¶ 46, ECF Doc. 2-3, *Coreas v. Bounds*, et al., Case No. 8:20-cv-00780 (D. Md., filed March 24, 2020); Ex. 11, Declaration of Robert B. Greifinger ("Greifinger Decl.") ¶ 13, ECF Doc. 4, *Dawson v. Asher*, Case No. 2:20-cv-00409-JLR-MAT (D. Or., filed March 16, 2020)

type of novel virus.[84]

51.     Medical experts have emphasized that urgent action in the jails is an essential public health priority because outbreaks will place incredible strain on regional hospitals and health centers. Experts, like Dr. Meyer, make clear that "[r]educing the size of the population in jails and prisons is crucially important to reducing the level of risk both for those within those facilities and for the community at large."[85]

52.     Public health experts, including Dr. Gregg Gonsalves,[86] Ross MacDonald,[87] Dr. Marc Stern,[88] Dr. Oluwadamilola T. Oladeru, and Adam

---

[84] Ex. 10, Mishori Decl. ¶ 46, *supra* note 51.

[85] Ex. 2, Meyer Decl. ¶ 37, *supra* note 37.

[86] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak*, Ct. Mirror (Mar. 11, 2020), https://cutt.ly/BtRSxCF.

[87] Craig McCarthy & Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* N.Y. Post (Mar. 19, 2020), https://cutt.ly/ptRSnVo.

[88] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (Mar. 5, 2020), https://cutt.ly/EtRSm4R.

Beckman,[89] Dr. Anne Spaulding,[90] Homer Venters,[91] and Josiah Rich[92] have all strongly cautioned that people booked into and held in jails are likely to face serious, even grave, harm due to the outbreak of COVID-19.

53.    According to Dr. Stern, "taking immediate and concerted efforts to implement preventive steps, as well as reducing the population to the lowest number possible prioritizing those who are elderly or have underlying medical conditions defined by the CDC, will increase public safety via reducing public health risk."[93]

54.    In response to this need for immediate action, jails and prisons nationwide have released people, in order to prevent community outbreaks of severe illness and death from COVID-19. For example, Los Angeles County, California

---

[89] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, HealthAffairs Blog (Mar. 10, 2020), https://cutt.ly/QtRSYNA.

[90] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail*, Emory Center for the Health of Incarcerated Persons (Mar. 9, 2020).

[91] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (Mar. 12, 2020), https://cutt.ly/jtRSPnk.

[92] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (Mar. 13, 2020, 3:00pm), https://cutt.ly/itRSDNH.

[93] Ex. 1, Stern Decl. ¶ 13.

has released more than 3,500 people;[94] New York released more than 1,600 people;[95] New Jersey 1,000 people;[96] Cuyahoga County, Ohio more than 800 people.[97]

55.     Internationally, governments have also responded to the threat posed by COVID-19 by releasing people from incarceration. In Iran, more than 80,000 people were temporarily released from prison to protect them and to protect the community from propagation of an outbreak.[98] In Ethiopia, more than 4,000 people were pardoned and released from incarceration to help prevent the spread of COVID-19.[99]

---

[94] *Los Angeles, Ventura County Jails Releasing Inmates To Cut Risk Of Coronavirus Exposure*, CBSN L.A. (May 3, 2020), https://losangeles.cbslocal.com/2020/04/15/coronavirus-jails-releasing-inmates-los-angeles-county-ventura-county/.

[95] Rosa Goldensohn, *Covid-Sick at Rikers On $1 Bail – And A Parole Violation*, The City (May 3, 2020), https://thecity.nyc/2020/04/rikers-island-early-release-sought-amid-coronavirus-soread.html.

[96] Tracey Tulley, *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html.

[97] Ronnie Dahl, *Will reduced crowding at Cuyahoga County Jail continue after the coronavirus crisis?*, 19 News (May 3, 2020), https://www.cleveland19.com/2020/04/23/will-reduced-crowding-cuyahoga-county-jail-continue-after-coronavirus-crisis/.

[98] Parisa Hafezi, *Iran Temporarily Frees 85,000 From Jail Including Political Prisoners*, Reuters (Mar. 17, 2020), https://www.reuters.com/article/us-health-coronavirus-iran-prisoners/iran-temporarily-frees-85000-from-jail-including-political-prisoners-amid-coronavirus-idUSKBN21410M.

[99] Bukola Adebayo, *Ethiopia pardons more than 4,000 prisoners to help prevent coronavirus spread*, CNN (Mar. 26, 2020),

56.     States and other local jurisdictions have also made changes to existing carceral policies in response to the COVID-19 pandemic, including eliminating medical co-pays for incarcerated people and waiving fees for phone calls and video communication.[100] Others have required facilities to distribute and make available sanitation supplies and hand sanitizer to everyone who is incarcerated, arranged for the immediate evaluation and treatment of anyone with symptoms, and enacted screening procedures for everyone who enters the jail or prison.[101]

57.     Over the past two weeks, multiple courts have also acknowledged the severe and urgent threats posed by COVID-19 and have accordingly ordered the release of detained and incarcerated persons.[102]

---

https://www.cnn.com/2020/03/26/africa/ethiopia-pardons-4000-prisoners-over-coronavirus/index.html.

[100] Mich. Joint Task Force on Jail & Pretrial Incarceration, *Jail Population Reduction to Curb the Spread of COVID-19* (May 1, 2020), *available at* https://courts.michigan.gov/NewsEvents/press_releases/Documents/Jails%20Task%20Force%20press%20release%20on%20COVID-19_FINAL.pdf.

[101] *See, e.g.*, *Preparedness and Response Plan 5-8*, Indiana Dep't of Correction (2020), *available at* https://www.in.gov/idoc/files/IDOC%20Pandemic%20Response%20Plan%203-3-2020.pdf#response%20plan.

[102] *See, e.g.*, *Castillo et al. v. Barr*, 5:20-cv-00605, ECF Doc. 32 (C.D. Cal. Mar. 27, 2020) (ordering petitioners be released from immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); *USA v. Garlock.*, No. 18 Cr 00418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (ordering, sua sponte, extension of convicted defendant's surrender date and noting "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *Xochihua-Jaimes v. Barr*, 798 F. App'x 52 (9th Cir. Mar. 24,

## THE COVID-19 PANDEMIC HAS
## REACHED WAYNE COUNTY AND SWIFT ACTION IS NEEDED TO
## PREVENT A MASS OUTBREAK IN THE JAIL

58.     Distressingly, Michigan's coronavirus case count is doubling every three days,[103] and the state is nowhere close to hitting the apex of the COVID-19 pandemic.[104]

59.     The Governor of Michigan declared a state of emergency on March 10, 2020, after two positive cases of COVID-19 were confirmed in Michigan—one in

---

2020) (ordering, sua sponte, that petitioner be immediately released from immigration detention "[i]n light of the rapidly escalating public health crisis" related to COVID-19 that public health authorities predict will especially impact immigration detention centers"); *U.S. v. Stephens*, 15 Cr. 95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (granting motion for reconsideration of defendant's bail conditions and releasing him from jail to home confinement, explaining that "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent" and that "inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop"); *In re: Extradition of Alejandro Toledo Manrique*, No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109, at *2 (N.D. Cal. March 19, 2020) (ordering release on bond despite government assertions that facility has preparedness plan in place and no cases have been confirmed).

[103] Kristen Jordan Shamus & Kristi Tanner, *'Southeast Michigan is burning': Michigan's coronavirus case count doubles every 3 days*, Detroit Free Press (May 4, 2020), https://www.freep.com/in-depth/news/local/michigan/2020/03/28/michigan-coronavirus-surge-covid-19-case-count/2898574001/.

[104] Courtney Vinopal, *WATCH: Michigan Gov. Gretchen Whitmer gives coronavirus update*, PBS (May 4, 2020), https://www.pbs.org/newshour/health/watch-live-michigan-gov-gretchen-whitmer-gives-coronavirus-update.

Wayne County and the other in Oakland County.[105] On March 26, 2020, the Wayne County Local Health Department issued a Local Public Health Emergency Order.[106] This order serves as a directive for daily screening procedures for employees working at essential businesses. The procedures include: asking if the employee has symptoms of fever, cough, shortness of breath, sore throat, or diarrhea; use of a touchless/contactless thermometer to conduct temperature checks is strongly recommended; and asking if the employee has had close contact in the last 14 days with an individual diagnosed with COVID-19.[107]

60.     On March 15, 2020, the Michigan Supreme Court issued Administrative Order 2020 instructing all trial courts in Michigan to take all "reasonable measures to avoid exposing participants in court proceedings, court employees, and the general public to the COVID-19 virus." The Order further instructs courts to reduce jail populations by "tak[ing] into careful consideration public health factors arising out of the present state of emergency" in making bond determinations and determining conditions or probation.

---

[105] *Michigan Executive Order No. 2020-04 Declaration of State of Emergency*, (Mar. 10, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521576--,00.html.

[106]Emergency Public Health Order in Response to the COVID-19 Pandemic Under MCL 333.2453, *available at* https://www.waynecounty.com/departments/hhvs/wellness/novel-coronavirus-information.aspx.

[107] *Id.*

61.    On March 23, 2020, Governor Whitmer issued a statewide stay-at-home order and ordered all non-essential businesses to close to bolster efforts to fight the ongoing COVID-19 outbreak.[108] And, on April 24, 2020, Governor Whitmer issued Executive Order 2020-62, specifically underscoring the life-or-death threat that the COVID-19 pandemic poses to people incarcerated in county jails throughout Michigan, as well as to jail staff and the community at large. The order sets forth necessary protocols that the Michigan Department of Corrections, county jails, local lockups, and juvenile detention centers must implement to reduce exposure risks to the virus.[109] These protocols include:

> a.    "Screening all persons arriving at or departing from a facility, including staff, incarcerated persons, vendors, and any other person entering the facility, in a manner consistent with guidelines issued by the Centers for Disease Control and Prevention ('CDC'). Such screening includes a temperature reading and obtaining information about travel and any contact with persons under investigation for COVID-19 infection."

> b.    "Restricting all visits, except for attorney-related visits, and conducting those visits without physical contact to the extent feasible.";

---

[108] *Michigan Executive Order No. 2020-21 Temporary requirement to suspend activities that are not necessary to sustain or protect life,* (Mar. 23, 2020), https://content.govdelivery.com/attachments/MIEOG/2020/03/23/file_attachments/1408152/EO%202020-21%20Stay%20Home,%20Stay%20Safe.pdf.

[109] *Michigan Executive Order 2020-62 Temporary COVID-19 protocols for entry into Michigan Department of Corrections facilities and transfers to and from Department custody; temporary recommended COVID-19 protocols and enhanced early-release authorization for county jails, local lockups and juvenile detention centers* (May 4, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-527098--,00.html.

c.      "Limiting off-site appointments except for urgent or emergency medical treatment."

d.      "Developing and implementing protocols for incarcerated persons who display symptoms of COVID-19, including methods for evaluation and processes for testing, notification of the Department of Health and Human Services ('DHHS'), and isolation during testing, while awaiting test results, and in the event of positive test results. These protocols should be developed in consultation with local public health departments."

e.      "Notifying DHHS of any suspected case that meets the criteria for COVID-19 through communication with the applicable local public health department."

f.      "Providing, to the fullest extent possible, appropriate personal protective equipment to all staff as recommended by the CDC."

g.      "Conducting stringent cleaning of all areas and surfaces, including frequently touched surfaces (such as doorknobs, handles, light switches, keyboards, etc.), on a regular and ongoing basis."

h.      "Ensuring access to personal hygiene products for incarcerated persons and correctional staff, including soap and water sufficient for regular handwashing."

i.      "Ensuring that protective laundering protocols are in place."

j.      "Posting signage and continually educating on the importance of social distancing, handwashing, and personal hygiene."

k.      "Practicing social distancing in all programs and classrooms— meaning a distance of at least six feet between people in any meeting, classroom, or other group."

l.      "Minimizing crowding, including interactions of groups of 10 or more people, which may include scheduling more times for meal and recreation to reduce person-to-person contact."

62.   On March 26, 2020, Michigan Supreme Court Chief Justice Bridget M.

McCormack and Sheriff Matt Saxton, Executive Director of the Michigan Sheriffs'
Association, issued a joint statement urging Judges and Sheriffs "to reduce and
suspend jail sentences for people who do not pose a public safety risk" and "release
far more people on their own recognizance as they await their day in court,"
emphasizing that "[f]ollowing this advice WILL SAVE LIVES" during this global
pandemic.[110]

63.    The Michigan Joint Task Force on Jail and Pretrial Incarceration
similarly highlighted the grave risk of fatal infection in county jails: "As high traffic
institutions characterized by relatively confined spaces, the threat of COVID-19 is
particularly acute in our county jails. Individuals in jail, including law enforcement
and correctional officers, are at an elevated risk of being exposed to the virus and
spreading it to others through inadequate social distancing." Accordingly, they
admonished "justice system decision makers to continue taking all necessary actions
to keep our communities safe through arrest alternatives, de-incarceration as
appropriate, and social distancing."[111]

---

[110] *Michigan Court News Release* (May 4, 2020),
https://courts.michigan.gov/News-
Events/press_releases/Documents/CJ%20and%20MSA%20Joint%20Statement%2
0draft%202%20(003).pdf.

[111] *Jail Population Reduction to Curb the Spread of COVID-19* (May 4, 2020)
https://courts.michigan.gov/News-
Events/press_releases/Documents/Jails%20Task%20Force%20press%20release%2
0on%20COVID-19_FINAL.pdf.

## DEFENDANTS' RESPONSES TO THE COVID-19 PANDEMIC ARE CONSTITUTIONALLY DEFICIENT AND PLACE THE PEOPLE IN ITS CUSTODY AT HEIGHTENED RISK

64.     The Jail is comprised of three buildings: Divisions I, II, and III. Division I, referred to colloquially as the "New Jail," houses nearly 60 women and over 100 men. Most of these individuals are pre-trial detainees. Division II, referred to as the "Old Jail," sits kitty corner from Division I and houses almost 420 men, many of whom are also pre-trial detainees. Both Divisions I and II are near Wayne County's Third Circuit Court, where criminal cases are heard. Division III is located in Hamtramck and houses almost 200 men, most of whom are post-conviction detainees.

65.     Despite the aforementioned repeated urgent calls to reduce jail populations and implement *basic* protective measures, Defendants have failed to take sufficient steps in any of the three Divisions to do either. And Defendants are woefully unprepared and incapable of taking necessary precautions to protect and provide adequate medical treatment for the people currently confined in the Jail in the face of this unprecedented, life-threatening public health crisis.Defendants well know that people incarcerated in the Jail face a significant risk of exposure to COVID-19. The CDC, the Governor, medical experts, and various advocates have repeatedly alerted the Defendants to the imminent risk of serious harm and death, and the preventive measures necessary to protect against the further spread of

COVID-19The Jail's screening measures do not meet CDC standards. When a detainee arrives at the Jail, his or her temperature is checked, but he or she is not formally tested. The detainee is then "quarantined" for only three days. This is contrary to the Centers for Disease Control's recommendation that individuals in jail settings remain quarantined for a period of 14 days.[112] In quarantine, a handful of detainees are each separated into their own 5 x 5 one-person, unpressurized cage-like cell so air flows freely between them. Each cell is equipped with a sink and a lidless toilet that is approximately one foot away from the bed. During the day, detainees are locked in their cells for all but one hour.

66.    Jail staff, who inconsistently wear protective gear, cycle in and out of the quarantine area. Meal service is provided by non-quarantined trustees who wear gloves but not masks, and food is served in carryout containers that are first examined by Jail staff who are not wearing gloves or masks. The detainees share one shower, which is not cleaned during the three-day quarantine period, and each detainee is provided with hotel-sized bars of soap with which to shower and wash his hands. The amount of soap that a detainee receives is under the discretion of jail

---

[112] Ex. 7, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control & Prevention (May 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidancecorrectional-detention.html.

staff. Requests for additional soap are often refused. In order to conserve soap, detainees break the bar apart into smaller pieces.

67.    After three days in "quarantine," detainees are transferred to a different unit without any additional testing or screening. They are housed in small, often poorly ventilated, units of up to as many as 50 people with either one or two-person cells or four-person cubicles. Beds in the two-person cells and four-person cubicles are approximately one to two feet away from one another, making it impossible to maintain a distance of at least six feet. In most cases, detainees do not wear masks while they sleep.

68.    Some cells are equipped with sinks and toilets. The toilets have no lids, and they are located only one foot away from the beds. Further, in Division I, the toilet from one cell is connected to the toilet in the neighboring cell, and when the toilet in one cell is flushed, excrement from that toilet flows to the neighboring toilet. Many of the sinks only partially operate, either because the water will not run, or because they are too dirty for use. In the female wards, detainees find maggots, fruit flies, or other bugs in the sinks, and the sink and toilet water is interchangeable, making it impossible for detainees in those wards to clean their hands.

69.    During the day, detainees congregate in communal spaces with shared showers, tables, seating, telephones, and tablets. And, unless their cells are equipped with a toilet and sink, detainees share bathrooms. In most cases, detainees have

43

limited or no access to disinfectant or paper towel with which to sanitize these high-touch, high-use shared surfaces, so they are forced to rely on the Jail for cleaning services. These surfaces are cleaned as infrequently as once weekly. Each person must therefore risk COVID-19 infection when touching and speaking through the phone or tablet, utilizing the bathroom facilities, and eating at the same table.

70.    During meals, detainees typically eat at communal tables (made of metal or wood particle) located in the common area outside of their cells. It is almost always impossible, even with reduced populations, to maintain a distance of six feet from any other detainee while sitting at the tables, and detainees do not wear their masks while they eat.

71.    All meals are prepared in the kitchen by trustees and an outside vendor at Division III. The trustees and vendors wear gloves but, until April 10, they did not have masks, and none of them have been tested or otherwise screened for COVID-19.

72.    Meals are distributed to detainees by the Sheriff's Deputies or trustees. The trustees are sporadically provided gloves and masks, but the deputies inconsistently wear protective gear and, in some cases, do not wear any gear at all. In at least one division (Division I), loose plasticware is placed in a single bag, which is passed around from one detainee to another with instructions to "take one and pass it down." In one facility, Division III, there have been periods where trustees used

44

garbage bags to cover their hands because they were not provided gloves with which to serve meals to other detainees.

73.     None of the detainees have access to alcohol-based hand sanitizer, and palm-size hotel-type bars of all-purpose soap are inconsistently distributed to the various units. Detainees are forced to use this single small bar of soap to wash their hands, clothes, and take a body shower. The soap is extremely drying and causes breakouts of little bumps on the skin, similar to psoriasis. Some units have a regular supply of soap, while others are provided with soap only once weekly. The soap runs out quickly, and requests for additional soap are denied. If detainees want additional hygiene products, they have to purchase them from the commissary. A bar of soap is $1.65.

74.     On floor five in Division II, the detainees' only shared shower was flooded with standing water for seven days. They took "bird baths" in the sink in order to clean themselves. In Division III there are numerous showers that are inaccessible because they do not run hot water.

75.     The Jail provides one or two rolls of toilet paper weekly; when detainees run out, which is not uncommon, the Jail refuses to provide additional toilet paper.

76.     Detainees are not provided with paper towel to dry their hands; instead, they use their towels or their uniforms. New towels and uniforms are supposed to be

distributed once or twice weekly, but recently laundry has been irregular, and in some cases, detainees have been without clean linens for three weeks. Detainees are not reissued the same uniforms or towels.

77.    Laundry for all three Jail divisions is done at Division III by select detainees. Prior to April 10, those detainees wore gloves but no masks. All of the laundry items come into close contact with other people in the jail, ensuring that any respiratory aerosols or droplets remain on the clothing long after they are transmitted. One of the detainees who worked in the laundry prior to April 1, Michael Meshinski, was infected with COVID-19. The extent to which he contaminated the laundry distributed to all three facilities is unknown. It is also unknown whether the laundry facility has been disinfected.

78.    People confined in the jail are not provided adequate cleaning supplies in the proper concentrations of strength to prevent transmission of the virus. Detainees are forced to create their own cleaning solutions by mixing shampoo, jail issued all-purpose soap or soap that is purchased from the commissary, and heavily diluted Simple Green multi-purpose solution, which is not a disinfectant and does not kill viruses.

79.    Nor are people in the Jail provided adequate cleaning supplies to clean their own cells, even when they request them from Jail staff and when they are transferred to new units or cells within the facility.

80.     Detainees are not provided with protective equipment consistent with CDC standards, if they are provided any at all. With the exception of detainees who work in laundry or food service, none of the detainees have access to gloves. On April 10, for the first time, the Jail distributed cloth masks to some detainees, others received paper masks, and detainees were instructed to keep the masks for two weeks, after which time they would receive replacements. The Jail has subsequently distributed new masks to some detainees but not others.

81.     The Jail has a shortage of protective gear, and there is apparently no established protocol requiring staff to wear protective gear, even if they are physically touching detainees, serving food, doing rounds, or otherwise coming in contact with the detainee population. Although some staff wear both gloves and masks, other staff members, including guards, nurses, and outside vendors, wear no protective equipment whatsoever. Others wear gloves but not masks, or masks but not gloves. These inconsistent protective practices are also true of Jail staff who have tested positive for COVID-19.

82.     The Jail provides detainees with little or no information about COVID-19. Jail staff have acknowledged that distancing is impossible and soap is not always available. Signs posted in Division II instruct detainees to "use a tissue for coughs" and "avoid touching your face," but no tissue is provided.

83.     The Jail, otherwise, has provided no information about COVID-19,

47

including basic prevention guidance; the risks associated with infection, especially to certain vulnerable populations; symptoms; and available treatments. Instead, detainees rely exclusively on the news and family and friends to learn about the virus. When detainees ask the guards for information, guards are dismissive or falsely advise detainees that they are safer from infection inside the Jail.

84.   Although many of the detainees have underlying conditions that make them particularly vulnerable to serious COVID-19-related illness or death, responses to requests for medical treatment take days or weeks. Complaints of illness or requests for medical attention are often ignored or dismissed. In some cases, detainees who complain of illness are threatened with disciplinary action. When people complain to guards or ask about medical treatment, they are told that unless they are dying or having a medical emergency they will not be seen.

85.   In the rare instance that the Jail responds to requests for treatment, and a detainee is notably ill, he is sent to a make-shift infirmary in Divisions II or III. Detainees in these units are tested for COVID-19, though results are typically two weeks delayed because the Jail has no on-site doctors.

86.   Detainees in the infirmaries are provided masks, but not gloves, and they receive clean uniforms, linens, and towels only every two weeks.

87.   They have no access to paper towel or any disinfectant to clean shared spaces and surfaces, including phones, tablets, tables, and showers.

88.    "Medical treatment" provided by the Jail consists of Tylenol, cough syrup, and Gatorade.

89.    Detainees in the Division II infirmary are allowed out of their cells during the day, but the unit has no seating. Thus, when they watch television, detainees sit on the floor or lean against a bannister within inches of one another.

90.    In the Division III infirmary, detainees are relegated to their cells for 23 hours daily, but the rooms are not pressurized, and, thus, air passes between rooms, exposing them to an increased risk of airborne transmission. Each detainee is allowed one hour outside of his cell daily, and, this is the only time during the day that he can shower, watch television, or communicate with friends or family using the telephone or a tablet. The detainees are staggered so no two are out simultaneously, but the common areas and high-touch surfaces are never disinfected; they are cleaned only with Simple Green, which again is not a disinfectant.

91.    In the infirmaries in both Divisions, new sick detainees are routinely transferred to the units. As a result, detainees continue to be re-exposed to the virus, and at least three detainees have been ill for approximately one month, and two have tested positive more than once. Although detainees have complained about this issue to the Jail, their complaints are completely dismissed, and the Jail plainly has no system whatsoever to properly isolate patients in their varying stages of illness.

92.    Publicly, the Jail claims that, as of April 22, only 13 detainees have

49

tested positive for COVID-19.[113] That number is almost certainly vastly undercounted, due to the Jail's failure to test detainees unless they are seriously visibly ill.[114] Throughout the last few weeks, many detainees have experienced and continue to experience varying degrees of symptoms and illness.

93.    In early April, laundry worker Michael Meshinski died alone in his home from COVID-19-related complications after he was released from the jail on April 1.[115] During the two weeks before his release, he was ill with a fever and lost bowel control, but his pleas for medical attention were ignored. *Id*. According to declarant Mark Malec, who was housed on the same cellblock, Mr. Meshinski visited the medical unit a few times, but was always returned to his 50-detainee unit the same day. On or about the day he was released, Mr. Meshinski was so ill that a Deputy sent him to the medical unit, and he never returned. The Jail gave Mr.

---

[113] Amber Ainsworth, *177 Wayne County Sheriff's Office employees, 13 jail inmates test positive for COVID-19*, Click On Detroit (May 4, 2020), https://www.clickondetroit.com/news/local/2020/04/23/177-wayne-county-sheriffs-office-employees-13-jail-inmates-test-positive-for-covid-19/.

[114] *See e.g.*, Linda So & Grant Smith, *In four U.S. state prisons, nearly 3,300 inmates test positive for coronavirus -- 96% without symptoms*, Reuters (Apr. 25, 2020), https://www.reuters.com/article/us-health-coronavirus-prisons-testing-in/in-four-us-state-prisons-nearly-3300-inmates-test-positive-for-coronavirus-96-without-symptoms-idUSKCN2270RX.

[115] *See* Charlie LeDuff, *LeDuff: Wayne County Jail Gave An Infected Inmate A Bus Pass Home. Now He's Dead*, Deadline Detroit (Apr. 7, 2020), https://www.deadlinedetroit.com/articles/24915/leduff_the_wayne_county_jail_gave_an_infected_inmate_a_bus_pass_home_now_he_s_dead.

Meshinski nothing more than a bus pass to get back to his home in Taylor.[116] He was found dead in his home that Sunday, and the Wayne County Medical Examiner listed COVID-19 as the cause of death.[117]

94.    Nevertheless, the Jail insufficiently tests screens, and monitors potentially infected or ill detainees. Detainees are routinely transferred from one unit to another and one division of the Jail to another without being tested or otherwise evaluated for possible exposure or infection. Only approximately 10% of detainees have been formally tested for the virus. This is true even for newly admitted detainees, and participants in the Jail's work release program. Additionally, the Jail houses detainees in the work release programs in open pods with detainees who remain in the Jail. This revolving door creates a heightened risk of exposure or infection.

95.    The Jail's testing and screening protocol is similarly deficient for its revolving door of staff, contracted vendors, and detainees, any of whom could carry the virus into the facility. This is true even though 177 Jail employees have tested positive for COVID-19 and 4 have died, including 2 Jail physicians.[118]

---

[116] *See id.*

[117] *Id.*

[118] *See* Ariana Taylor, *13 Detainees in the Wayne County Jail Have Contracted COVID-19*, The Detroit News (Apr. 24, 2020), https://www.detroitnews.com/story/news/local/wayne-county/2020/04/22/13-detainees-wayne-county-jail-have-contracted-covid-19/3005465001/.

96.     The above-discussed Jail conditions continue to pose a substantial risk of harm, including severe illness or death, to detainees. Still, the Wayne County Sheriff's Office and County officials responsible for Jail operations and the protection of detainees and staff have failed to respond adequately with even the most basic public health protections.

97.     In violation of Petitioners/Plaintiffs' Eighth and Fourteenth Amendment rights, the Jail is blatantly disregarding the known, obvious risks of illness and death and needlessly exposing people to a serious risk of contracting a highly-fatal infectious disease.

98.     To unnecessarily expose people detained at the Wayne County Jail to the serious risk of contracting COVID-19 is constitutionally impermissible. Failure to act with speed and urgency will constitute a wholesale violation of the constitutional rights of those confined in the Jail.

## IMMEDIATE RELEASE IS THE ONLY RESPONSE THAT SERVES PUBLIC HEALTH, COMMUNITY SAFETY, AND THE INDIVIDUAL SAFETY OF EACH CLASS MEMBER

99.     Immediate release of medically vulnerable Plaintiffs, as well as the subclass of medically vulnerable people they represent, remains a necessary public health intervention.[119]

100.    Given the size of the Jail, the configuration of its cells, and staffing, the

---

[119] Ex. 14, Lauring Decl. ¶¶ 42-43.

jail population must be significantly decreased to ensure adequate social distancing. In this unique moment, release *enhances* the safety of the community and is necessary to protect the Plaintiff's own health and safety. Petitioners/Plaintiffs must be able to exercise self-protective measures in a sanitary, disinfected space and to maintain social distance from other community members to flatten the curve of the virus's spread and protect themselves from infection.

101.   Release is needed not only to prevent irreparable harm to members of the medically vulnerable subclass, but also to sufficiently reduce the incarcerated population at the Jail to ensure proper social distancing necessary to reduce transmission for all class members and the wider public. Because of the rapidity with which COVID-19 spreads and the danger it poses, immediate release is both necessary and the least intrusive intervention to ensure Class Members are provided medically and constitutionally-sufficient treatment.

102.   If immediate action is not taken to dramatically reduce the population of the Jail, all people who remain incarcerated will be at grave and unacceptable risk of contracting COVID-19—a serious and potentially life-threatening illness. People confined in prisons and jails must "be furnished with the basic human needs, one of which is 'reasonable safety,'" *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) (citations omitted), which is virtually impossible given the realities of the COVID-19 pandemic and the limitations inherent in the Jail.

103. With confirmed COVID-19 cases and deaths amongst staff and detainees, an outbreak within the facility has already begun. In order to meaningfully reduce the risk of serious illness and death, the jail population must be reduced drastically. After reviewing declarations from detainees and recently released detainees detailing conditions inside the Jail's three divisions, discussed in detail below, University of Michigan Professor Adam Lauring, an infectious disease medical doctor and expert in virology, has emphasized that further "[r]educing the size of the population in the Wayne County Jail is the only way to prevent a further outbreak."[120]

104. Medical experts specializing in correctional health similarly share Dr. Lauring's urgent recommendations to dramatically reduce the population of detention centers, jails, and prisons. Dr. Ranit Mishori, Senior Medical Consultant for Physicians for Human Rights and an expert in correctional health issues, has concluded that "[r]eleasing people from incarceration is the best and safest way to prevent the spread of disease and reduce the threat to the most vulnerable incarcerated people" and that "[i]mmediate release is crucial for individuals with chronic illnesses or other preexisting conditions."[121] Release is "both necessary and urgent" given that "[t]he window of opportunity is rapidly narrowing for mitigation

---

[120] Ex. 14, Lauring Decl. ¶ 42

[121] Ex. 10, Mishori Decl. ¶ 46.

of COVID-19."

105.   Dr. Jonathan Giftos, the former Medical Director for Correctional Health Services at Riker's Island, concluded that, "the only way to really mitigate the harm of rapid spread of coronavirus in the jail system is through depopulation, releasing as many people as possible with a focus on those at highest risk of complication."[122]

106.   Other correctional medical and public health experts have also urged the release of people from incarceration given the heightened risk of transmission and infection, including Dr. Marc Stern (the former Assistant Secretary for Health Care at the Washington State Department of Corrections),[123] Dr. Robert B. Greifinger (former manager of medical care for people incarcerated in the New York State prison system and current federal court monitor of medical care in three large county jails),[124] a group of doctors who work in New York City's jails, hospitals and shelters,[125] as well as a group of more than 200 Johns Hopkins faculty in public

---

[122] *Recipe for disaster: The spread of corona virus among detained populations*, MSNBC (May 3, 2020), https://www.msnbc.com/all-in/watch/-recipe-for-disaster-the-spread-of-coronavirus-among-detained-populations-80947781758.

[123] Ex. 1, Stern Decl. ¶¶10–12, 14.

[124] Ex. 11, Greifinger Decl. ¶ 13.

[125] Brad Lander, *Doctors in NYC Hospitals, Jails, and Shelters Call on the City to Take More Aggressive Action to Combat the Spread of Coronavirus*, Medium (Mar. 12, 2020), https://medium.com/@bradlander/doctors-in-nyc-hospitals-jails-and-shelters-call-on-the-city-totake-more-aggressive-action-to-fb75f0b131c2.

health, bioethics, medicine, and nursing.[126]

107.   These experts have opined that unless social distancing can be meaningfully implemented, it is impossible to protect public and individual health. Release is thus necessary under the Constitution to respond to this unprecedented coronavirus pandemic.

108.   Releasing people from the jails would also reduce the burden on regional hospitals and health centers.

## CLASS ACTION ALLEGATIONS

109.   The named Petitioners/Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Federal Rule of Civil Procedure 23(b)(2).

110.   The class that Petitioners/Plaintiffs seek to represent is defined as all current and future persons held at the Jail during the course of the COVID-19 pandemic ("Jail Class), including three subclasses:

    a. The "Pretrial Subclass" is defined as: "All current and future persons detained at the Wayne County Jail during the course of the COVID-19 pandemic who have not yet been convicted of the offense for which they are currently held in the Jail."

---

[126] Letter from Johns Hopkins faculty to Governor Hogan (May 4, 2020), https://bioethics.jhu.edu/wp-content/uploads/2019/10/JohnsHopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf.

b. The "Post-conviction Subclass" is defined as: "All current and future persons detained at the Wayne County Jail during the course of the COVID-19 pandemic who are have been sentenced to serve time in the Jail or who are otherwise in the Jail as the result of an offense for which they have already been convicted."

c. The "Medically Vulnerable Subclass" is defined as: "All members of the Jail Class who are also over the age of fifty, or who, regardless of age, experience an underlying medical condition that places them at particular risk of serious illness or death from COVID-19, including but not limited to (a) lung disease, including asthma, chronic obstructive pulmonary disease (*e.g.* bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or

(l) a current or recent (last two weeks) pregnancy."

111.    This action is brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a).

112.    On May 4, 2020, the Jail confined over 800 people, all of whom are eligible members of this class. Therefore, the class and subclasses meet the numerosity requirement of Federal Rule of Civil Procedure 23(a).

113.    The subclasses are also too numerous for joinder of all members to be practicable. In Michigan, presumptively innocent pretrial detainees constitute approximately 50% of all people in jails.[127] The Pretrial and Post-conviction subclasses, therefore, likely each include approximately half of the class. And, Demographic data regarding the health of correctional populations indicates that well over 30% of detained people suffer from at least one condition rendering them medically vulnerable.[128] Thus, the medically vulnerable subclass likely contains

---

[127] *See* Mich. Joint Task Force on Jail & Pretrial Incarceration, *Report and Recommendations* 7 (Jan. 10, 2020), https://courts.michigan.gov/News-Events/Documents/final/Jails%20Task%20Force%20Final%20Report%20and%20 Recommendations.pdf.

[128] Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform*, Prison Policy Initiative (Mar. 6, 2020), www.prisonpolicy.org/blog/2020/03/06/pandemic/.

hundreds of people as well.

| Health condition | Prevalence of health condition by population | | | |
| --- | --- | --- | --- | --- |
| | Jails | State prisons | Federal prisons | United States |
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

*Health conditions that make respiratory diseases like COVID-19 more dangerous are far more common in the incarcerated population than in the general U.S. population. Pregnancy data come from our report, Prisons neglect pregnant women in their healthcare policies, the CDC's 2010 Pregnancy Rates Among U.S. Women, and data from the 2010 Census. Cigarette smoking data are from a 2016 study, Cigarette smoking among inmates by race/ethnicity, and all other data are from the 2015 BJS report, Medical problems of state and federal prisoners and jail inmates, 2011-12, which does not offer separate data for the federal and state prison populations. Cigarette smoking may be part of the explanation of the higher fatality rate in China among men, who are far more likely to smoke than women.*

114. Joinder is impracticable because the class members are numerous; the class is fluid due to the inherently transitory nature of pretrial incarceration; and the class members are incarcerated and  low-income, which limits their ability to institute individual lawsuits. Certifying this class supports judicial economy.

115. Common questions of law and fact exist as to all members of the class. The named Petitioners/Plaintiffs seek common declaratory and injunctive relief concerning whether Defendants' policies, practices, and procedures violate the constitutional rights of the class members. These common questions of fact and law include, but are not limited to:

a. Whether the conditions of confinement at the Jail since the beginning of the COVID-19 pandemic amount to constitutional violations;

b. What measures Defendants implemented in the Jail in response to the COVID-19 crisis;

    c. Whether Defendants' practices during the COVID-19 pandemic exposed people confined at the Jail to a substantial risk of serious harm; and

    d. Whether Defendants knew of and disregarded a substantial risk of serious harm to the safety and health of the class.

116. Plaintiffs' claims are typical of the class members' claims. The injuries that Petitioners/Plaintiffs have suffered due to Defendants' unconstitutional course of conduct are typical of the injuries suffered by the class. All class members seek the same declaratory and injunctive relief.

117. The Petitioners/Plaintiffs are adequate representatives of the class because their interests in the vindication of the legal claims they raise are entirely aligned with the interests of the other class members, each of whom has the same constitutional claims. There are no known conflicts of interest among members of the proposed class, and the interests of the named Petitioners/Plaintiffs do not conflict with those of the other class members.

118. Petitioners/Plaintiffs are represented by counsel with experience and success in litigating complex civil rights matters in federal court. The interests of the members of the class will be fairly and adequately protected by the named Petitioners/Plaintiffs and their attorneys.

119. Because the putative class challenges Defendants' system as

60

unconstitutional through declaratory and injunctive relief that would apply the same relief to every member of the class, certification under Rule 23(b)(2) is appropriate and necessary.

120.   A class action is the only practicable means by which the named Petitioners/Plaintiffs and class members can challenge the Defendants' unconstitutional actions and obtain the necessary immediate declaratory and injunctive relief sought for themselves and all other members of the class.

## CLAIMS FOR RELIEF

### COUNT I: Declaratory and Injunctive Relief for Violation of the Eighth Amendment (42 U.S.C. § 1983)
*Jail Class and Post-Conviction Subclass versus All Defendants*

121.   Petitioners/Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

122.   Under the Eighth Amendment, as applicable to States and their political subdivisions through the Fourteenth Amendment, post-convicted persons in carceral custody have a right to be free from cruel and unusual punishment. As part of the right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail. *See, e.g., Estelle*, 429 U.S. at 104; *DeShaney*, 489 U.S. at 200.

123.   As part of this right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail. Deliberate

indifference to the serious risk COVID-19 poses to members of the Jail Class, and particularly members of the Medically-Vulnerable Subclass, violates this right.

124. Petitioners/Plaintiffs, and the class they represent, suffer a substantial risk of serious harm to their health and safety due to the presence of, and spread of, COVID-19.

125. Defendants know of and are failing to abate the serious risks that COVID-19 poses to Plaintiffs, including severe illness, permanent physical damage, and death. These risks are well-established and obvious to Defendants.

126. Defendants are subjecting Petitioners/Plaintiffs to conditions of confinement that increase their risk of contracting COVID-19, for which there is no known vaccine, treatment, or cure. Due to the conditions at the Jail, Petitioners/Plaintiffs are unable to take steps to protect themselves—such as social distancing, accessing medical attention or testing, or washing their hands regularly— and Defendants have failed to provide adequate protections or mitigation measures. Defendants act with deliberate indifference towards Petitioners/Plaintiffs by failing to adequately safeguard their health and safety in the midst of a potential outbreak of a contagious, infectious disease.

127. As a result of Defendants' unconstitutional actions, Petitioners/Plaintiffs are suffering irreparable injury.

128. Accordingly, Defendants, as supervisors, direct participants, and policy

makers for Wayne County, have violated and are violating the rights of the Post-trial

Subclasses under the Eighth Amendment.

**COUNT II: Declaratory and Injunctive Relief for Violation of the Fourteenth Amendment (42 U.S.C. § 1983))**
*Pretrial Subclass versus All Defendants*

129.   Petitioners/Plaintiffs   incorporate by   reference   each   and   every

allegation contained in the preceding paragraphs as if set forth fully herein.

130.   Under the Fourteenth Amendment, corrections officials are required to

provide   for   the   reasonable   health   and   safety   of   persons   in   pretrial   custody.

*Youngberg   v.   Romeo*, 457   U.S.   307, 315–16, 324 (1982) (the state has an

"unquestioned duty to provide adequate . . . medical care" for detained persons); *see*

*also   City   of   Revere   v.   Mass.   Gen.   Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due

process rights of a [pretrial detainee] are at least as great as the Eighth Amendment

protections available to a convicted prisoner.").

131.   Due process claims brought by pretrial detainees under the Fourteenth

Amendment are evaluated under an objective standard. *See Richmond*, 885 F.3d at

938 n.3; *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en

banc); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017); *Miranda v. Cty. of*

*Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Members of the Pre-Trial subclass are not

required to show that Defendants are subjectively aware of a substantial risk of

serious harm due to COVID-19, although if such a showing is required that standard is met under the circumstances presented here.

132.   The Jail has neither the capacity nor the ability to comply with public health guidelines to prevent an outbreak of COVID-19 and cannot provide for the safety of the Jail Class. Defendants' actions and inactions result in the confinement of members of the Jail class in a facility where they do not have the capacity to test for, treat, or prevent COVID-19 outbreaks, which violates Plaintiffs' rights to treatment and adequate medical care.

133.   Defendants violate Petitioners/Plaintiffs' due process rights by failing to adequately safeguard their health and safety in the midst of a potential outbreak of a contagious, infectious disease. Petitioners/Plaintiffs face a serious risk of intense pain, illness, lasting bodily damage, and ultimately, death in the Jail due to the Defendants' insufficient measures to prevent the spread of infection.

134.   Accordingly, Defendants, as supervisors, direct participants, and policy makers for Wayne County, have violated and are violating the rights of the Pre-trial Subclass under the Fourteenth Amendment.

### Count III: Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241

*Medically-Vulnerable Subclass versus all Defendants*

135.   Petitioners/Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

64

136.   Because the Medically Vulnerable Plaintiffs/Petitioners and subclass seek release in light of the immediate and urgent risks to their health and lives, there is no other available remedy that could protect their rights.

137.   Respondents/Defendants are holding Petitioners/Plaintiffs in custody in violation of the Due Process Clause of the Eighth and/or Fourteenth Amendment to the Constitution of the United States. Both amendments forbid exposing Petitioners/Plaintiffs to a severe risk of death, pain, or permanent severe injury, and at this time, with respect to the Medically-Vulnerable Subclass, no options available to Respondents/Defendants will adequately mitigate that risk other than release from custody.

138.   Section 2241(c)(3) allows this court to order the release of people like Plaintiffs who are held "in violation of the Constitution." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear, not only from the language of §§ 2241(c)(3) and 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."). Such relief is appropriate where, as here, there are no set of conditions under which an individual can be constitutionally detained, and the petitioner is thus "challenging

the fact, not conditions, of her confinement."[129]

## COUNT IV: Declaratory and Injunctive Relief for Violation of the Fourteenth Amendment (42 U.S.C. § 1983))

*Medically Vulnerable Subclass versus All Defendants*

139.    Petitioners/Plaintiffs repeat and re-allege paragraphs 1 through 113 as if fully set forth in this Count.

140.    The Medically Vulnerable Plaintiffs/Petitioners and subclass seek release in light of the immediate and urgent risks to their health and lives. There is no other available remedy that could protect their rights.

141.    Respondents/Defendants are holding Petitioners/Plaintiffs in custody in violation of the Due Process Clause of the Eighth and/or Fourteenth Amendment to the Constitution of the United States. Both amendments forbid exposing Petitioners/Plaintiffs to a severe risk of death, pain, or permanent severe injury. At this time, with respect to the Medically Vulnerable Subclass, no options are available to Respondents/Defendants that will adequately mitigate that risk other than removing the Petitioners/Plaintiffs from custody at the Jail.

142.    Accordingly, Petitioners/Plaintiffs are entitled to be transferred to a form of custody that does not expose them to an unconstitutional risk of substantial harm, including a transfer to home confinement.

---

[129] Ex. 15, Order at 8, *Malam v. Adducci,* No. 20 cv-10829 (E.D. Mich. Apr. 6, 2020), DE 23.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners/Plaintiffs and the Putative Class Members respectfully request that the Court:

A. Certify the proposed class and subclasses;

B. Enter a declaratory judgment that Defendants are violating Named Plaintiffs' and Class Members' constitutional rights by failing to adequately safeguard their health and safety in the midst of a potential outbreak of a contagious, infectious disease;

C. Enter a temporary restraining order, preliminary injunction, and permanent injunction, and/or writ of habeas corpus requiring Defendants to immediately release all Medically Vulnerable Petitioners/Plaintiffs and Subclass Members or transfer them to home confinement;

D. Enter a temporary restraining order, preliminary injunction, and permanent injunction requiring, during the COVID-19 pandemic, for Defendants to:

    1. Effectively communicate to all people incarcerated, including low-literacy and non-English-speaking people, sufficient information about COVID-19, measures taken to reduce the risk of transmission, and any changes in policies or practices to reasonably ensure that individuals are able to take precautions to prevent infection;

    2. Provide adequate spacing of six feet or more between people

incarcerated, so that social distancing can be accomplished;

3.  Ensure that each incarcerated person receives, free of charge: (1) an individual supply of liquid hand soap and paper towels sufficient to allow frequent hand washing and drying each day, and (2) an adequate supply of disinfectant hand wipes or other products effective against the virus that causes COVID-19 for daily cleanings;

4.  Ensure that all incarcerated people have access to hand sanitizer containing at least 60% alcohol;

5.  Provide an adequate stock of daily cleaning supplies, such as sponges, brushes, disinfectant hand wipes, and/or disinfectant products effective against the virus that causes COVID-19;

6.  Provide sufficient disinfecting supplies, free of charge, so incarcerated people can clean high-touch areas or items (including, but not limited to, telephones, tablets, tables, bathrooms, seating, and door handles) between each use;

7.  Provide daily access to clean showers and clean laundry, including clean personal towels and washrags for each shower;

8.  Require that all Jail staff wear personal protective equipment, including masks and gloves, when interacting with any person or when touching surfaces in cells or common areas;

9.  Require that all Jail staff wash their hands with soap and water or use hand sanitizer containing at least 60% alcohol both before and after touching any person or any surface in cells or common areas;

10. Take each incarcerated person's temperature daily (with a functioning, properly operated, and sanitized thermometer) to identify potential COVID-19 Infections.

11. Conduct immediate testing for anyone displaying known symptoms of COVID-19 and who has potentially been exposed to infection;

12. Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 receive adequate medical care and are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, phone and video calls with loved ones, communications with counsel, and personal property;

13. Respond to all emergency (as defined by the medical community) requests for medical attention within an hour;

14. Waive all medical co-pays for those experiencing COVID-19-related symptoms; and

15. Cease and desist retaliatory disciplinary action in response to (a) incarcerated persons' requests for medical attention and basic,

69

necessary protections, and/or (b) efforts by incarcerated persons to publicize unsafe and life-threatening conditions inside the Jail.

E.  If immediate release is not granted on the basis of this Petition alone, expedite review of the Petition, including oral argument, via telephonic or videoconference if necessary;

F.  Enter an order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

G.  Order such other and further relief as this Court deems just, proper, and equitable.

DATED:                          Respectfully submitted,

/s/Ashley A. Carter
Ashley A. Carter (DC Bar No. 979793)
Thomas B. Harvey (MBE #61734MO)
Miriam R. Nemeth (MI Bar No.
P76789; DC Bar No. 1028529)
ADVANCEMENT PROJECT
NATIONAL OFFICE
1220 L Street NW, Suite 850
Washington, DC 20005
Tel: (202) 728-9557
tharvey@advancementproject.org
acarter@advancementproject.org
mnemeth@advancementproject.org

/s/Martin L. Saad
Martin L. Saad (DC Bar No. 462096)*
Sheena R. Thomas (DC Bar No.
1020290)*
Khary J. Anderson (DC Bar No.
1671197)*
VENABLE LLP
600 Massachusetts Avenue NW
Washington, DC 20001
Tel: (202) 344-4000
MLSaad@Venable.com
SRThomas@Venable.com
KJAnderson@Venable.com

/s/Allison L. Kriger
Allison L. Kriger (MI Bar No. P76364)
LARENE & KRIGER, P.L.C.
645 Griswold Street, Suite 1717

/s/Christopher N. Moran
Christopher N. Moran (MD Bar No.
1512160132)*

70

Detroit, Michigan 48226
Tel: (313) 967-0100
allison.kriger@gmail.com

*/s/Alec Karakatsanis*
Alec Karakatsanis (DC Bar No. 999294)*
A. Dami Animashaun (DC Bar No. 1614199)*
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Ste. 800
Washington, DC 20009
Tel: (202) 894-6126
alec@civilrightscorps.org
dami@civilrightscorps.org

Emily J. Wilson (MD Bar No. 1801040016)*
VENABLE LLP
750 E. Pratt Street, Ste. 900
Baltimore, MD 21202
Tel: (410) 244-7400
CNMoran@Venable.com
EJWilson@Venable.com

*/s/Desiree M. Ferguson*
Desiree M. Ferguson (MI Bar No. P34904)
Amanda Alexander (MI Bar No. P77795)*
DETROIT JUSTICE CENTER
1420 Washington Blvd., Suite 301
Detroit, MI 48226
Tel: (313) 736 -5957
dferguson@detroitjustice.org
aalexander@detroitjustice.org

*Attorneys for Plaintiffs/Petitioners*

*Applications for admission forthcoming